CLERK'S OFFICE
A TRUE COPY
May 17, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
)
*(Briefly describe the property to be searched* )  Case No.   23   MJ   103
*or identify the person by name and address)* )
)
Business located at 1017 West Glen Oaks Lane, )
Suite 212, Mequon, Wisconsin 53092, more fully )
described in Attachment A. )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Business located at 1017 West Glen Oaks Lane, Suite 212, Mequon, Wisconsin 53092, more fully described in Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 331(a) | Introduction of misbranded drugs into interstate commerce; |
| 21 U.S.C. § 331(k) | doing an act which results in drugs or devices being misbranded while held for sale; |
| 21 U.S.C. § 331(p) | failure to register as a drug or device manufacturer as required by 21 U.S.C. § 360; and |
| 21 U.S.C. § 331(t) | unlicensed wholesale distribution of prescription drugs. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Houston E. Ramsey Jr., FDA/OCI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date:  5/17/2023

_____
*Judge's signature*

City and state:  Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

**Houston E. Ramsey Jr.**, being first duly sworn, depose and say that I am Special Agent with the Food and Drug Administration/Office of Criminal Investigations ("FDA/OCI"), and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the businesses Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Credit Group, and R & J Wealth Consulting LLC, which are located at 1017 West Glen Oaks Lane, Suite 212, in Mequon, Wisconsin 53092 (hereafter referred to as the TARGET PREMISES), further described, respectively, in Attachment A, for the items described in Attachment B.

2.    Attached to this affidavit as Exhibit 1 is a previously filed affidavit in support of two search warrant applications.  The resulting federal warrants were executed on March 2, 2023, in the Middle District of Florida.  Exhibit 1 contains a description of my professional history and is incorporated by reference here in support of the current application for a search warrant authorizing a search of the TARGET PREMISES.

3.    I am familiar with the facts and circumstances surrounding this investigation, both from my own investigative activities and from information obtained from law enforcement officers and others with personal knowledge of the facts.  Those facts necessary to establish probable cause are included in this affidavit.

This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based upon my training and experience and the facts set forth in Exhibit 1 and this affidavit, there is probable cause to believe that owners, lessees, renters and/or occupants of the TARGET PREMISES have committed violations of 21 U.S.C. §§ 331(a) (introduction of misbranded drugs into interstate commerce), 331(k) (doing an act which results in drugs or devices being misbranded while held for sale), 331(p) (failure to register as a drug or device manufacturer as required by 21 U.S.C. § 360); as well as 331(t) (unlicensed wholesale distribution of prescription drugs). In addition, there is probable cause to believe that evidence, fruits, and instrumentalities of these unlawful activities, as more fully described in Attachment B, will be found at the TARGET PREMISES.

## PROBABLE CAUSE

5.      As discussed in detail in Exhibit 1, I am currently conducting an investigation of the businesses Rapid Rx USA Inc, Rapid Rx USA LLC, and Helping Diabetics USA, Inc. and their owner KENNETH FANNING. The investigation has revealed that FANNING was purchasing and storing diverted prescription drugs from various unlicensed sources through his unlicensed businesses Rapid Rx USA LLC and Helping Diabetics USA, Inc. located at 3105 North Main Street in Jacksonville, Florida 32206. This investigation also revealed that FANNING and other co-conspirators were also selling and shipping diverted prescription drugs from Florida to various pharmacies located throughout the United States. They were also falsely

2

reporting on invoices that these diverted prescription drugs originated from

FANNING's licensed drug wholesale business Rapid Rx USA Inc., which was

registered and licensed, but at an unoccupied building located at 555 Charlie Smith Sr

Highway, Unit 5, in Saint Marys, Georgia 31558.  This investigation has further

identified RYAN JACKSON, and his businesses Cream City Medical Depot LLC,

The Elite Jackson Group LLC, R & J Credit Group, and R & J Wealth Consulting

LLC – all located at the TARGET PREMISES – as an unlicensed source of diverted

prescription drugs for FANNING and his businesses.

6.      As described in Exhibit 1, during a trash pull conducted on November 8,

2022, a Federal Express (FedEx) shipping label, dated "06Sep22," addressed from

4130 North 14th Street in Milwaukee, Wisconsin 53209 was found in the trash

dumpster behind FANNING's businesses, Rapid Rx USA LLC and Helping Diabetics

USA, Inc.  In addition to the business name, "Cream City Medical Depot," and the

address of 4130 North 14th Street in Milwaukee, Wisconsin 53209, this shipping label

also contained a telephone number, (414)704-6546, for this business, as well as the

FedEx tracking number, 277650116499, for the associated shipment.

7.      On March 2, 2023, during the execution of the federal search warrant on

FANNING's businesses, and a related search (with FANNING's consent) of an

adjoining business location, I observed several opened shipment boxes addressed from

4130 North 14th Street in Milwaukee, Wisconsin 53209 inside the business locations.

Each shipment contained the handwritten business name of "Elite Jackson Group"

addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209.  Additionally,

3

these same shipments also contained an affixed FedEx shipping label addressed from "Cream City Medical Depot" at 4130 North 14th Street in Milwaukee, Wisconsin 53209. One of these shipments contained a FedEx shipping label, dated "09Jan23," addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209 containing several bottles of the prescription drug Biktarvy, which is used for Human Immunodeficiency Virus (HIV) treatment. In addition to the business names, "Cream City Medical Depot" and "Elite Jackson Group," and the address of 4130 North 14th Street in Milwaukee, Wisconsin 53209, this shipping label also contained a telephone number, (414)704-6546, for this business, as well as the FedEx tracking number, 393163626249, for the associated shipment.

8. Continuing on March 2, 2023, the search team also located 12 purchase invoices or purchase orders from Helping Diabetics USA, Inc., dated between September 9, 2022, and December 13, 2022, totaling $417,295.00. These seized records documented the purchase or requested purchase of various prescription drugs from the business name "Elite Jackson," with the contact's name "Ryan Tradal," who provided the email address "tradal7878@gmail.com." Upon reviewing these purchase orders or purchase invoices, I observed one of these invoices, dated "Oct 26, 2022," provided the typed address of 4130 North 14th Street in Milwaukee, Wisconsin 53209 as being the address for "Elite Jackson." I also observed two of these invoices, dated "Nov 21, 2022, and Dec 01, 2022," also contained the removed address labeling from the shipments made to FANNING's businesses that were stapled to these invoices. I further observed these labels contained the address of 4130 North 14th Street in

4

Milwaukee, Wisconsin 53209 as being the addresses for "Elite Jackson Group" and "Cream City Medical Depot." Additionally, on this same date, four "Elite Jackson Group LLC' invoices, dated between September 19, 2022, and December 5, 2022, totaling $173,228.00, were seized from FANNING's residence during the execution of a federal search warrant. These records documented the sale of various prescription drugs to FANNING and his businesses. Upon reviewing these invoices, I observed these invoices included the name of the business, "Elite Jackson Group LLC," an email address, "tradal7878@gmail.com," and two of these invoices contained the name RYAN JACKSON.

9. Continuing on March 2, 2023, during the execution of the federal search warrant on FANNING's businesses, FedEx delivered 29 shipment boxes addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209 to FANNING's businesses. Each shipment contained the handwritten business name of "Elite Jackson Group" addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209. Additionally, these same shipments also contained an affixed FedEx shipping label addressed from "Cream City Medical Depot," at 4130 North 14th Street in Milwaukee, Wisconsin 53209, the telephone number (414)704-6546, and the FedEx tracking numbers for the associated shipments. Upon receiving consent to search these shipment boxes from FANNING, I determined some of these boxes contained the prescription drugs Biktarvy, Linzess, Tradjenta, Movantik, Latuda, Xarelto, Brilinta, Symbicort, Spiriva, Nurtec, Flovent, Incruse, Stiolto, Emgality, Humalog, Novolog, Lantus, Levemir, Trulicity, Janumet, Farxiga, Entresto, Januvia, Eliquis, Rybelsus,

5

Rexulti, Ubrelvy, Myrbetriq, Victoza, Ozempic, Ventolin, Breztri, Anoro, Trelegy, Enbrel, Toujeo, Tresiba, and Soliqua. Two of these shipment boxes contained "Elite Jackson Group LLC" invoices, #1115 and #1116, for the sale of the above listed prescription drugs. "Elite Jackson Group LLC" invoice #1115 was dated "Feb 9, 2023," contained the email address tradal7878@gmail.com, and the invoice amount of $30,564.00. "Elite Jackson Group LLC" invoice #1116 was dated "Feb 18, 2023," contained the email address tradal7878@gmail.com, and the invoice amount of $37,750.00.

10. On March 3, 2023, I determined from an open-source search of Accurint that telephone number (414)704-6546 belongs to RYAN JACKSON.

11. On March 9, 2023, I received subpoenaed bank account information from Wells Fargo Bank that identified a personal checking account for FANNING. I determined from the statements of this account that multiple PayPal payments were made to the business "Elitejackso." I further determined from this subpoenaed bank account information that FANNING's business, Helping Diabetics USA, Inc., wired three payments in September and December 2022, totaling $88,000.00, into a U.S. Bank account in the business name of Cream City Medical Depot LLC located at 1017 Glen Oaks Lane, Suite 160, in Mequon, Wisconsin 53092.

12. On March 10, 2023, I received subpoenaed account information from PayPal that identified an account in the name of "Rapid Rx USA" registered by FANNING. I determined from the transaction log of this account that between June 16, 2022, and February 10, 2023, a total of 98 PayPal payments were made to "Elite

Jackson Group LLC," with an email address of "tradal7878@gmail.com," for a total of approximately $934,589.00.

13. On March 14, 2023, I conducted open-source corporation searches of the Wisconsin Secretary of State website, wdfi.org, of Cream City Medical Depot. I determined from this search that there is an active Wisconsin corporation, registered since May 2020, for Cream City Medical Depot LLC located at 4130 North 14th Street in Milwaukee, Wisconsin 53209. Additionally, I conducted a Google Maps search of the address located at 4130 North 14th Street in Milwaukee, Wisconsin 53209 and determined that this address is a residence. Lastly, I conducted an open-source search of the Milwaukee County property appraiser's website, Milwaukee.gov, of the address located at 4130 North 14th Street in Milwaukee, Wisconsin 53209 and determined this residence is owned by RYAN T. JACKSON.

14. Continuing on March 14, 2023, I conducted Google searches of the business name, Cream City Medical Depot LLC, and the address of 4130 North 14th Street in Milwaukee, Wisconsin 53209. I located from this search a website for Cream City Medical Depot LLC, www.creamcitymeddepot.com, and the telephone numbers, (414)285-0121, (414)209-3061, and (888)901-1011 for the business. Upon reviewing this website, I determined it was for the purchase of medical devices, *i.e.*, diabetic test strips, lancets (small sterile needles used to draw blood for checking blood sugar levels in diabetes patients), and meters/monitors as well as prescription drugs. Upon further reviewing this website, I observed the prescription drugs the website was requesting to be purchased from sellers were 26 different inhaler products, 20 different insulin

7

products, and 19 different "tablets" products. I determined the prescription "tablets" requested to be purchased on the website were Brilinta, Eliquis, Farxiga, Janumet, Januvia, Jardiance, Latuda, Linzess, Tradjenta, Vraylar, and Xarelto. I also determined the website provided links to their Facebook and Twitter accounts, which displayed a photograph of the prescription drugs Ozempic, Trelegy, and Symbicort on their home page. I further determined the website listed the business address as being 333 West Brown Deer Road, Unit G – 1095, in Milwaukee, Wisconsin 53217. Additionally, I conducted a Google Maps search of the address located at 333 West Brown Deer Road, Unit G – 1095, in Milwaukee, Wisconsin 53217. I determined from this search that this address was the address for a "Pack n' Ship" location, a business used by customers for packing, shipping, printing, and business services.

15.     On March 20, 2023, "Ryan Jackson Elite Jackson Group" sent a text message from telephone number (414)704-6546 to the cellular telephone of FANNING, who told me that this telephone number was RYAN JACKSON's. Upon reviewing the text message, I observed a photograph of the GSK prescription drug inhaler Flovent HFA 110mcg (NDC number 0173-0719-20) sent with the question, "Can you take?" "Ryan Jackson Elite Jackson Group" subsequently followed this message on this same date with two photographs of an Elite Jackson Group LLC invoice, number 1120, dated "Mar 7, 2023," containing the email address tradal7878@gmail.com in the amount of $62,221.00 for the offered sale of various prescription drugs and devices, i.e., OneTouch meters, OneTouch Verio diabetic test strips, FreeStyle meters, and Dexcom G6 sensors. I determined some of the

8

prescription drugs listed on this invoice were for the sale of the prescription drugs Rexulti, Rybelsus, Biktarvy, Emgality, Movantik, Myrbetriq, and others.

16. On April 3, 2023, I received subpoenaed bank account information from U.S. Bank that identified a Cream City Medical Depot LLC business checking account in the name of RYAN T. JACKSON. I determined from this account signature card that RYAN T. JACKSON provided his telephone number, (414)704-6546, and the address for Cream City Medical Depot LLC as being located at 1017 West Glen Oaks Lane, Suite 160, in Mequon, Wisconsin 53092. Additionally, I determined from the statements of this account that multiple payments were received from FANNING's businesses. I further determined from this subpoenaed bank account information from U.S. Bank that RYAN T. JACKSON also had a personal checking account. I determined from this account signature card that RYAN T. JACKSON provided his telephone number, (414)704-6546, and home address as being located at 4130 North 14th Street in Milwaukee, Wisconsin 53209.

17. On April 4, 2023, I conducted open-source corporation searches of the Wisconsin Secretary of State website, wdfi.org, of The Elite Jackson Group LLC. I determined from this search that there is an active Wisconsin corporation, registered since January 2016, for The Elite Jackson Group LLC located at 4130 North 14th Street in Milwaukee, Wisconsin 53209. Additionally, RYAN T. JACKSON is the corporation's registered agent, and 4130 North 14th Street in Milwaukee, Wisconsin 53209 was provided as the registered agent's office address.

18.     Continuing on April 4, 2023, I conducted an open-source Florida drug wholesale license verification search, utilizing the Florida Department of Business and Professional Regulation's (FDBPR) website, myfloridalicense.com, of Cream City Medical Depot LLC, The Elite Jackson Group LLC, and RYAN JACKSON. I determined from this search that the companies and RYAN JACKSON were not licensed in the State of Florida as a drug or device manufacturer, repackager, logistics provider, or wholesaler. Additionally, I conducted an open-source Wisconsin drug wholesale license verification search utilizing the Wisconsin Department of Safety and Professional Services website, licensesearch.wi.gov, of Cream City Medical Depot LLC, The Elite Jackson Group LLC, and RYAN JACKSON. I determined from this search that the companies and RYAN JACKSON were not licensed in the State of Wisconsin as a wholesale distributor of prescription drugs or as a drug manufacturer. Additionally, I determined from this same search that RYAN JACKSON is not licensed in the State of Wisconsin as a medical professional, *i.e.*, a physician, a nurse, a pharmacist, an anesthesiologist, or a dentist.

19.     On April 5, 2023, "Ryan Jackson Elite Jackson Group" sent another text message from telephone number (414)704-6546 to the cellular telephone of FANNING, who previously identified this telephone number as RYAN JACKSON's. Upon reviewing this message, I observed a photograph of the Teva prescription drug Epinephrine Injection USP, 0.3mg, two pack pen (NDC number 0093-5986-27) with the question, "Are you able to still buy something like this?"

Case 2:23-mj-00103-WED    Filed 05/17/23    Page 11 of 78    Document 1

20.     On April 17, 2023, I conducted a Google search of the address 1017 West Glen Oaks Lane, Suite 160, in Mequon, Wisconsin 53092, and observed a Glen Oaks Office Park, Mikkelson Builders, www.mikkelsonbuilders.com, posting that identified suite 160 being available for lease as office space and no longer occupied.

21.     On April 20, 2023, I reviewed electronic evidence, *i.e.,* cellular telephone, seized from FANNING's residence during the execution of the federal search warrant and that had been identified belonging to FANNING.  Upon reviewing the contacts on this cellular telephone, I observed a contact entered and saved on this cellular telephone as "Ryan Jackson Elite Jackson Group" for the telephone number (414)704-6546.  I also observed a contact entered and saved on this cellular telephone as "Ryan Jackson" with the email address tradal7878@gmail.com.  Upon reviewing the text messages on this cellular telephone, I observed several exchanged text message conversations concerning the pricing, purchasing, and selling of prescription drugs. Additionally, I observed a text message, dated September 13, 2022, in which "Ryan Jackson Elite Jackson Group," from telephone number (414)704-6546, sent bank wire instructions to FANNING for payment to be made to Cream City Medical Depot LLC located at 1017 Glen Oaks Lane, Suite 160, in Mequon, Wisconsin 53092.

22.     On April 24, 2023, with the assistance of another FDA/OCI agent, I conducted a trash pull of two trash receptacles pulled to the curb in the rear of 4130 North 14th Street in Milwaukee, Wisconsin 53209, which is owned and occupied by RYAN T. JACKSON.  I observed a large black trash bag inside each trash receptacle and collected these trash bags for review.  Upon reviewing the contents of the first

11

trash bag, I observed several articles of mail addressed to the business names "R & J Wealth Consulting LLC" and "Cream City Medical Depot" at the TARGET PREMISES. I also observed several articles of mail addressed to the business names of "R & J Credit Group LLC," "R & J Logistics LLC," "Elite Jackson Group LLC," and "Brew City Medical LLC" at 4130 North 14th Street in Milwaukee, Wisconsin 53209. I also observed several articles of mail addressed to the business name "Ryan Jackson Trucking Inc" at "1017 West Glen Oaks Lane in Mequon, Wisconsin 53092." Additionally, I observed several articles of mail addressed to the names of "Ryan T. Jackson," "Ryan Tradal Jackson," and "Ryan Jackson" at 4130 North 14th Street in Milwaukee, Wisconsin 53209. Upon further review of this mail, I observed a Viking Plumbing Inc invoice addressed to RYAN JACKSON that provided his telephone number as being (414)704-6546.

23.     Continuing on April 24, 2023, I conducted open-source corporation searches of the Wisconsin Secretary of State website, wdfi.org, of R & J Credit Group LLC, R & J Wealth Consulting LLC, R & J Logistics LLC, Brew City Medical LLC and Ryan Jackson Trucking Inc. I determined from this search that R & J Credit Group LLC is an active Wisconsin corporation, registered since March 2022, with no address on file. I also determined R & J Wealth Consulting LLC is an active Wisconsin corporation, registered since February 2023, located at the TARGET PREMISES. I also determined R & J Logistics LLC is an active Wisconsin corporation, registered since August 2020, located at 4130 North 14th Street in Milwaukee, Wisconsin 53209. Additionally, RYAN JACKSON is the corporation's

12

registered agent, and 4130 North 14th Street in Milwaukee, Wisconsin 53209 was provided as the registered agent's office address. I also determined from this search that Brew City Medical LLC is a dissolved Wisconsin corporation, registered in March 2019, with no address on file. Lastly, I also determined, Ryan Jackson Trucking Inc. is an active Wisconsin corporation, registered since April of 2021, with no address on file, and RYAN JACKSON is the corporation's registered agent, and "1017 West Glen Oaks Drive in Mequon, Wisconsin 53092" was provided as the registered agent's office address.

24.     Continuing on April 24, 2023, I went to the TARGET PREMISES and observed an electronic directory of the tenants inside this office building which identified the business "Cream City Medical Depot" being located at suite 212. I then proceeded to suite 212 and observed business signage on this suite door that identified the name of the business as "R & J Credit Group LLC" and the suite number as being 212. With assistance of another FDA/OCI agent, I conducted surveillance on the TARGET PREMISES. Upon observing the last employee leave the TARGET PREMISES, I walked down the sidewalk outside the TARGET PREMISES and observed in plain view, through the TARGET PREMISES glass window, various brand name diabetic test strips, several prescription drug Anoro Ellipta inhalers, and several prescription drug Ubrelvy products all stacked on tables inside the TARGET PREMISES.

25.     On April 25, 2023, I conducted an address check of the TARGET PREMISES and observed a red 2016 Ford F150 truck bearing Wisconsin license plate

13

TK2592 parked in the parking lot of the TARGET PREMISES. Upon conducting a registration check of this vehicle license plate, I determined this vehicle was registered to RYAN T. JACKSON of 4130 North 14th Street in Milwaukee, Wisconsin 53209. I subsequently later walked inside this office building and proceeded to the TARGET PREMISES. Upon walking past the inside front office glass window of the TARGET PREMISES, I observed, in plain view, five cardboard boxes, *i.e.,* shipments, stacked inside the front room of the TARGET PREMISES that were similar in appearance to the previously described shipments observed in FANNING's businesses Rapid Rx USA LLC and Helping Diabetics USA, Inc. I observed these shipments contained the handwritten business name of "Elite Jackson Group" addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209 to "AMS, 2025 Route 522, Selinsgrove, PA 17870."

26. On April 26, 2023, I received subpoenaed FedEx Express account information from FedEx that identified a deleted "Cream City Medical Depot" business account in the name of RYAN JACKSON. I determined from this account summary that RYAN JACKSON provided his telephone number, (414)704-6546, and the address for Cream City Medical Depot being located at 1017 West Glen Oaks Lane, Suite 160, in Mequon, Wisconsin 53092. Additionally, I determined from these same subpoenaed FedEx Express account records a second active "Cream City Medical Depot" account in the name of RYAN JACKSON. I determined from this account summary that RYAN JACKSON provided his telephone number, (414)704-6546, and the address for Cream City Medical Depot being located at 4130 North 14th

14

Street in Mequon, Wisconsin 53092. The shipment summary of this active account showed that the previously mentioned FedEx tracking number, 393163626249, as well as the previously mentioned tracking numbers associated with the 29 shipment boxes delivered to FANNING's businesses, were all shipped utilizing this FedEx Express "Cream City Medical Depot" account in the name of RYAN JACKSON.

27.    Continuing on April 26, 2023, I conducted an address check of the TARGET PREMISES. I walked inside this office building and proceeded to the TARGET PREMISES. Upon walking past the inside front office glass window of the TARGET PREMISES I observed, in plain view, six cardboard boxes, *i.e.,* shipments, stacked inside the front room of the TARGET PREMISES that were similar in appearance to the previously described shipments observed in FANNING's businesses. I observed these shipments contained the handwritten business name of "Elite Jackson Group" addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209 to "AMS, 2025 Route 522, Selinsgrove, PA 17870." I subsequently walked down the sidewalk outside the TARGET PREMISES and observed in plain view, through the TARGET PREMISES glass window, various brand name diabetic test strips and several prescription drug Anoro Ellipta and prescription drug Trelegy Ellipta inhalers stacked on tables inside the TARGET PREMISES.

28.    On April 27, 2023, with the assistance of another FDA/OCI agent, I conducted surveillance on the TARGET PREMISES. I observed the same red 2016 Ford F150 truck bearing Wisconsin license plate TK2592 registered to RYAN T. JACKSON parked in the parking lot of the TARGET PREMISES. I walked inside

15

this office building and proceeded to the TARGET PREMISES. Upon walking past the inside front office glass window of the TARGET PREMISES I observed, in plain view, 14 cardboard boxes, *i.e.,* shipments, stacked inside the front room of the TARGET PREMISES that were similar in appearance to the previously described shipments observed in FANNING's businesses. I observed these shipments contained the handwritten business name of "Elite Jackson Group" addressed from 4130 North 14th Street in Milwaukee, Wisconsin 53209, most of which were addressed to "AMS, 2025 Route 522, Selinsgrove, PA 17870." A short time later, I observed an unknown male walk from the TARGET PREMISES to the previously mentioned red Ford F150 truck and retrieve three tan plastic Walgreens bags from inside this vehicle. I observed one of these bags contained the prescription drug Trulicity inside. I then observed this unknown male go inside the TARGET PREMISES with these bags. I then observed this same unknown male leave the TARGET PREMISES without the previously mentioned plastic Walgreens bags and return to the red Ford F150 truck registered to RYAN T. JACKSON. This same unknown male then retrieved a hand truck from this vehicle and entered the TARGET PREMISES with this hand truck. A short time later, I observed this same unknown male had removed eight of the previously mentioned cardboard boxes prepared for shipment from the TARGET PREMISES, utilizing this hand truck and place them in the back of the red Ford F150 truck, which was still parked in the TARGET PREMISES parking lot.

29.     On April 28, 2023, I received information from FDA/OCI Senior Operations Manager for the FDA's Center for Drug Evaluation and Research stating

16

that Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON have never registered with FDA as a drug manufacturing establishment at the TARGET PREMISES or 4130 North 14th Street in Milwaukee, Wisconsin. Additionally, I received information from the FDA/OCI Senior Operations Manager for the FDA's Center for Devices and Radiological Health stating that Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON have never registered with the FDA as a device manufacturing establishment at the TARGET PREMISES or 4130 North 14th Street in Milwaukee, Wisconsin.

30.     Continuing on April 28, 2023, I conducted an open-source Florida drug wholesale license verification search utilizing the FDBPR website, myfloridalicense.com, of Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON. I determined from this search that the companies and RYAN JACKSON were not licensed in the State of Florida as a drug or device manufacturer, repackager, logistics provider, or wholesaler. Additionally, I conducted an open-source Wisconsin drug wholesale license verification search utilizing the Wisconsin Department of Safety and Professional Services website, licensesearch.wi.gov, of Cream City Medical Depot

17

LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON. I determined from this search that the companies and RYAN JACKSON were not licensed in the State of Wisconsin as a drug or device manufacturer, repackager, logistics provider, or wholesaler.

31. On May 1, 2023, I confirmed with the Wisconsin Department of Safety and Professional Services that Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON were not licensed in the State of Wisconsin at all, including as a drug wholesaler or pharmacy, and confirmed they are required to be licensed in the State of Wisconsin. Additionally, I contacted the FDBPR and verified that Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit Group LLC, R & J Logistics LLC, Brew City Medical LLC, Ryan Jackson Trucking Inc, and RYAN JACKSON were not licensed in the State of Florida at all, including as a drug wholesaler, and confirmed they are required to be licensed in the State of Florida.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32. As described in Attachment B, these applications seek permission to search for records that might be found at the TARGET PREMISES, in whatever form they are found. As described above, RYAN JACKSON's businesses market products

18

through the use of a website, maintain email addresses, and like most businesses today, presumably store certain records electronically. Thus, one form in which the records might be found at the TARGET PREMISES is as data stored on a computer's hard drive or other storage media. Accordingly, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.    Based on my training and experience, I know that modern commercial entities, including businesses that sell drugs, use computer equipment to store business records, communicate with suppliers, and track sales, expenses, and inventory.

34.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

19

35.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

36.     *Forensic evidence.*  As further described in Attachment B, these applications seek permission to locate not only computer files that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and

processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

search warrant at a business.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated

22

camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the

23

computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

37. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.

Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the TARGET PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

25

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

38.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

39.  To the extent that the targets of this investigation are conducting some legitimate business, the seizure of computers may limit their ability to conduct lawful commerce.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, investigators will copy data, rather than physically seize computers.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

26

## CONCLUSION

40.     Based upon the foregoing facts, along with my training, experience, and consultation with others, I respectfully submit that there is probable cause to believe that the items described in Attachment B are currently located at TARGET PREMISES, in the Eastern District of Wisconsin, and that those items constitute evidence or instrumentalities of the crimes of 21 U.S.C. §§ 331(a), (k), (p) and (t). Specifically, there is probable cause to believe that RYAN JACKSON is using the TARGET PREMISES to operate illicit businesses, which purchase medical devices and drugs that have already been sold or otherwise distributed to members of the public, relabel and repackage those items, and then resell them, all without the appropriate licenses from the State of Florida, the State of Wisconsin, and without registering with the FDA.

Case 2:23-mj-00103-WED     Filed 05/17/23     Page 28 of 78     Document 1

# ATTACHMENT A

## Premises to Be Searched

The business to be searched (TARGET PREMISES) is located at 1017 West Glen Oaks Lane, Suite 212, in Mequon, Wisconsin 53092.  As depicted below, the TARGET PREMISES is a business suite located on the second floor within the Glen Oaks Office Park building numbered "1017" which is south of West Glen Oaks Lane and east of North Port Washington Road.  The Glen Oaks Office Park building is a two-story brick structure with gray and tan trim.  The suite number "212" is displayed to the oak wood signage for this suite with the business name of "R & J Credit Group LLC" attached to the oak wood door of the suite.

 



1

**<u>ATTACHMENT B</u>**

**ITEMS TO BE SEIZED**

1. Medical devices and drugs, and any item that reasonably appears to be a misbranded and/or unapproved device or drug;

2. Records and information pertaining to the ordering, shipping, purchasing, online marketing, selling, distribution, holding, and the storage of medical devices or drugs;

3. Records, information and items concerning any off-site locations capable of storing records, medical devices, or drugs, including safe deposit box keys, and records, receipts, and rental agreements concerning such storage locations;

4. Records and information associated with the purchase or sale of labeling, printing or graphics which could be used to create labeling or documentation of medical devices or drugs;

5. Items that can be used to remove, create, or affix labeling, printing, or graphics to medical devices, drugs, or their packaging;

6. Records and information evidencing occupancy or ownership of the premises to be searched, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, checks and check registers, and financial records;

7. Records and information pertaining to the establishment, ownership, and method of operation of Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit

1

Group LLC, R & J Logistics LLC, Brew City Medical LLC, or Ryan Jackson Trucking Inc.;

8.   Any and all computers, printers, computer equipment, hard drives, and other electronic storage medium that could be used for the ordering, shipping, purchasing, or selling of any drugs; used to create labeling, printing, or graphics for devices, drugs, or their packaging; or used to store or create any records or information, the seizure of which is authorized by this warrant;

9.   For any computer or storage medium whose seizure is otherwise authorized by this warrant (hereinafter, "COMPUTER"):

   a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

   c.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   d.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

   e.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

   f.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of

creation or storage, including any form of computer or electronic storage (such as

2

hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Without applying for another search warrant, this warrant authorizes the search of any COMPUTER whose seizure is otherwise authorized by this warrant for the items, records, and information authorized to be seized, as described above.

This warrant authorizes the seizure of digital records and information described above only to the extent that they were created, saved, or edited during time period from January 1, 2021, through the date of execution of the warrant, except that evidence of who used, owned, or controlled a COMPUTER may be from any period of time through the date of the execution of the warrant.

3

# EXHIBIT 1

## AFFIDAVIT

**Houston E. Ramsey Jr.,** being first duly sworn, depose and say that I am Special Agent with the Food and Drug Administration/Office of Criminal Investigations ("FDA/OCI"), and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the residence located at 1536 North Market Street in Jacksonville, Florida 32206 (hereafter referred to as TARGET PREMISES 1) and the businesses Rapid Rx USA LLC, Rapid Rx USA Inc. and/or Helping Diabetics USA, Inc., located at 3105 North Main Street in Jacksonville, Florida 32206 (hereafter referred to as TARGET PREMISES 2), further described, respectively, in Attachments A1 and A2, for the items described in Attachment B.

2.     I have been a Special Agent with the FDA/OCI since 2007. I am presently assigned to the Jacksonville Office as a Special Agent, investigating violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FDCA"), and have been so employed for approximately 15 years. I am an investigative and law enforcement officer of the United States within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, in that I am empowered under authority of the FDCA to conduct investigations and to make arrests. In my capacity as an FDA/OCI Special Agent, I have received extensive training in the investigation of the counterfeiting, diverting, misbranding, adulterating, and tampering of drugs and

medical devices. In addition, I have 15 years of prior combined law enforcement experience as a Special Agent with the United States Secret Service and as a police officer in the State of Florida with both the Pensacola Police Department and the Panama City Beach Police Department. During this time, I received extensive training in investigations of computer crimes, internet investigations, counterfeit currency, check fraud, bank fraud, money laundering, access device fraud, and identity theft, among other things. During my tenure with the FDA/OCI, I have participated in the execution of search warrants and arrest warrants and have conducted investigations in the areas of drug diversion, healthcare fraud, wire fraud, and mail fraud, as well as other FDCA criminal cases. During the course of these and other investigations, I have conducted or participated in physical and electronic surveillance, debriefed informants, and reviewed pertinent records. Through my training, education, and experience, I have become familiar generally with the efforts of persons involved in criminal activity to avoid detection by law enforcement.

3.     I am familiar with the facts and circumstances surrounding this investigation, both from my own investigative activities and from information obtained from law enforcement officers and others with personal knowledge of the facts. Those facts necessary to establish probable cause are included in this affidavit. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.     Based upon my training and experience and the facts set forth in this affidavit, there is probable cause to believe that owners, lessees, renters and/or

2

occupants of TARGET PREMISES 1 and TARGET PREMISES 2 have committed violations of 21 U.S.C. §§ 331(a) (introduction of misbranded drugs into interstate commerce), 331(k) (doing an act which results in drugs or devices being misbranded while held for sale), 331(p) (failure to register as a drug or device manufacturer as required by 21 U.S.C. § 360); 331(t) (unlicensed wholesale distribution of prescription drugs); as well as 18 U.S.C. §§ 670(a)(2) (knowingly and falsely making, altering, forging, or counterfeiting the labeling or documentation (including documentation relating to origination or shipping) of a pre-retail medical product)), 670(a)(3) (knowingly possessing, transporting, or trafficking in a pre-retail medical product), and 670(a)(6) (attempt or conspiracy to commit violation of § 670(a)(2) or (a)(3)). In addition, there is probable cause to believe that evidence, fruits, and instrumentalities of these unlawful activities as more fully described in Attachment B will be found at TARGET PREMISES 1 and 2.

## OVERVIEW OF PRESCRIPTION DRUG DIVERSION

5.     This affidavit is based on my personal observations, training, and experience, as well as information I have gained from other agents regarding investigations involving federally funded prescription drug programs for consumers, including the Medicare and Medicaid programs, and drug diversion.

6.     During the normal course of legitimate retail drug distribution, state-licensed retail pharmacies purchase the prescription drugs they dispense to patients from state-licensed wholesale distributors ("wholesalers").    As a result of these drug

3

purchases, the pharmacies receive wholesaler purchase invoices as a record of their purchase.

7.     When dispensing drugs to their customers, retail pharmacies affix patient labels to the drug bottles that display, among other things, identifying information about the pharmacy and patient, as well as dosage instructions for the patient.

8.     Once an FDA-approved prescription drug enters the wholesale distribution market, it can pass through many wholesalers before reaching a retail pharmacy.  This fact creates opportunities for criminals to insert questionable, if not completely illegitimate, products into the legitimate supply chain.  Within the wholesale distribution market of prescription drugs, a sub-market commonly referred to as the "diversion market" exists.  The practices within the "diversion market" include the illegal distribution of drug samples, the use of coupons redeemable for prescription drugs at no cost, the sale of stolen prescription drugs, the sale of expired prescription drugs, the unlawful diversion of deeply discounted drugs that were intended for hospitals and health care entities such as clinics, and the purchase of filled prescriptions from patients who receive drugs through social welfare programs.  These practices have helped fuel a multi-billion-dollar drug diversion market that provides a portal through which potentially dangerous misbranded, sub-potent, adulterated, expired, and counterfeit drugs enter the nation's drug distribution system.

9.     Among other potential dangers to consumers, diverted drugs may have been stored in uncontrolled conditions, which may not be sufficient to maintain the medical efficacy of such drugs over time; and the drugs themselves may have expired,

4

which also affects efficacy. For example, some prescription insulin medications intended to treat diabetes and named in this affidavit require constant cold-storage in temperatures between 36 and 46 degrees Fahrenheit in order to maintain their efficacy. Additionally, "diversion market" wholesalers prepare these diverted drugs to be resold. This may include "washing," a term which includes removing the original patient's prescription label from a prescription diverted drug product. "Washers" use cotton balls, Q-tips, and rags with common products such as paint thinner, fingernail polish remover, lighter fluid, and Goo Gone to remove patient prescription labels from the diverted drug products. Some "diversion market" wholesalers may counterfeit the packaging of these diverted drug products to mask the damaged caused by "washing."

10.     Illegally-diverted drugs, which can often be purchased for a price lower than the same prescription drug's wholesale price from a legitimate source, are eventually sold (or re-sold) to customers/patients and billed at the legitimate drug's retail value. "Diversion market" wholesalers will often provide false invoices, shipping records, and transactional statements to deceive the purchaser about the legitimacy of the supply chain. Schemes involving the distribution of diverted drugs can also result in federal health care benefit programs, such as Medicare and Medicaid, being defrauded. Moreover, these health care benefit programs, as well as insurance companies, would not knowingly reimburse pharmacies for the cost of diverted drugs being sold to customers.

5

## OVERVIEW OF APPLICABLE FDCA STATUTES

11.     FDA is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the FDCA.   Among other responsibilities, the FDA enforces laws and regulations intended to ensure that drugs and medical devices for human use are safe and effective for their intended uses and bear labeling that contains true and accurate information.

12.     Under 21 U.S.C. § 321(g), a "drug" is defined in relevant part as (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C).

13.     Under the FDCA, a "prescription drug" is any drug intended for use in humans that, because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary for its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or is limited by an approved application under 21 U.S.C. § 355 for use under the professional supervision of a practitioner licensed by law to administer such drug.  21 U.S.C. § 353(b)(1).

6

14.     Under 21 U.S.C. § 321(h), a "device" is defined in relevant part as an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is— (A) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (B) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (C) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

15.     Under 21 U.S.C. § 321(k), a "label" is defined in relevant part as "a display of written, printed, or graphic matter upon the immediate container of any article," and "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article," 21 U.S.C. § 321(m).

16.     Every person upon first engaging in the manufacture, preparation, propagation, compounding, or processing of a drug or drugs in any establishment which he owns or operates in any State shall immediately register with the FDA the name of such person, places of business of such person, all such establishments, the unique facility identifier of each such establishment, and a point of contact email address. 21 U.S.C. § 360(b)(1) & (c).  Such persons are also required to annually renew their

7

registration. 21 U.S.C. § 360(b)(1). At the time of initial registration, and biannually thereafter, drug manufacturers are also required to file a list of all the drugs being manufactured, prepared, propagated, compounded, or processed by them for commercial distribution. 21 U.S.C. § 360(j).

17.    Every person upon first engaging in the manufacture, preparation, propagation, compounding, or processing of a device or devices in any establishment which he owns or operates in any State shall immediately register with the FDA the name of such person, places of business of such person, and all such establishments. 21 U.S.C. § 360(b)(2) & (c). Such persons are also required to annually renew their registration. 21 U.S.C. § 360(b)(2). At the time of initial registration, and biannually thereafter, device manufacturers are also required to file a list of all the devices being manufactured, prepared, propagated, compounded, or processed by them for commercial distribution. 21 U.S.C. § 360(j).

18.    The term "manufacture, preparation, propagation, compounding, or processing" shall include repackaging or otherwise changing the container, wrapper, or labeling of any drug package or device package in furtherance of the distribution of the drug or device from the original place of manufacture to the person who makes final delivery or sale to the ultimate consumer or user. 21 U.S.C. § 360(a)(1).

19.    A drug or a device is misbranded under the FDCA if it is manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with FDA, if it is not included in a list of drugs manufactured by a facility

8

registered with FDA, or if it does not bear such symbols from the uniform system for identification of devices prescribed. 21 U.S.C. § 352(o).

20.     A drug or a device is misbranded under the FDCA if its "labeling is false or misleading in any particular." 21 U.S.C. § 352(a).

21.     No person may engage in wholesale distribution of a "prescription drug" in any State unless such person is (1) licensed by the State from which the drug is distributed; or (2) if the State from which the drug is distributed has not established a licensure requirement, is licensed by the Secretary of Health and Human Services; and if the drug is distributed interstate, is licensed by the State into which the drug is distributed if the State into which the drug is distributed requires the licensure of a person that distributes drugs into the State. 21 U.S.C. § 353(e)(1)(A). For the purposes of this provision, "wholesale distribution" means the distribution of a "prescription drug" to a person other than a consumer or patient, or receipt of a "prescription drug" by a person other than the consumer or patient.

### Prohibited Acts under the FDCA

22.     The FDCA prohibits, among other things, the doing or causing of the following:

      a. The failure to register as a drug or a device manufacturer, or to provide the required list of all drugs produced by a drug establishment, pursuant to 21 U.S.C. § 331(p);

      b. The introduction into interstate commerce of a misbranded drug or device, pursuant to 21 U.S.C. § 331(a);

9

c. The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to a drug or device if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being misbranded, pursuant to 21 U.S.C. § 331(k); and

d. The unlicensed wholesale distribution of a prescription drug, pursuant to 21 U.S.C. § 331(t).

Any violation of 21 U.S.C. § 331 is a Class A misdemeanor subject to a maximum penalty of one year in prison and a $100,000 fine or both. 21 U.S.C. § 333(a)(1), 18 U.S.C. § 3571. Such violations are also strict-liability misdemeanors, meaning no *mens rea* is required for criminal liability. However, if any violation of 21 U.S.C. § 331 is done with the intent to defraud and mislead, it is a felony, punishable by imprisonment of three years, a penalty of up to $250,000 for an individual, or both. 21 U.S.C. § 333(a)(2), 18 U.S.C. § 3571. Additionally, knowingly distributing prescription drugs in violation of the FDCA's wholesaler licensing requirements (at 21 U.S.C. § 353(e)(1)) is punishable by imprisonment of up to ten years and up to a fine of $250,000. 21 U.S.C. § 333(b)(1)(D).

## OVERVIEW OF APPLICABLE TITLE 18 CRIMES

23.     Under 18 U.S.C. § 670(a)(2), it is illegal to knowingly and falsely make, alter, forge, or counterfeit the labeling or documentation (including documentation relating to origination or shipping) of a pre-retail medical product. For the purposes of

10

this provision, a "medical product" means a drug, biological product, device, medical food, or infant formula, and a "pre-retail medical product" means a medical product that has not yet been made available for retail purchase by a consumer. 18 U.S.C. § 670(e).

24. Under 18 U.S.C. § 670(a)(3), it is also illegal to knowingly possess, transport, or traffic in a pre-retail medical product in which the labeling or documentation of which has been knowingly and falsely made, altered, forged, or counterfeited in violation of 18 U.S.C. § 670(a)(2). Further, under 18 U.S.C. § 670(a)(6), it is illegal to attempt or conspire to violate either 18 U.S.C. § 670(a)(2) or (a)(3).

## OVERVIEW OF APPLICABLE PRODUCTS

25. Ozempic, Trulicity, Bydureon Bcise, Semaglutide, Victoza, Januvia, Farxiga, Jardiance, and other similar products are FDA-approved prescription drugs used to improve blood sugar levels in diabetic patients. NovoLog, Levemir, Humalog, Toujeo Max Solostar, and other similar products are FDA-approved prescription insulin drugs used to treat blood sugar levels in diabetic patients. Wixela, Spiriva, Ventolin, Trelegy, Advair, Flovent, Singulair, ProAir HFA, Incruse Ellipta, Anoro Ellipta, Breo Ellipta, and other similar products are FDA-approved prescription inhaler drugs used to treat asthma or Chronic Obstructive Pulmonary Disease (COPD). All of the above listed prescription drugs may pose serious health risks to consumers such as pancreatitis, hypoglycemia, kidney failure, bronchospasm, acute

11

narrow-angle glaucoma, pneumonia, osteoporosis, increased blood pressure and/or a fast or irregular heartbeat.

## PROBABLE CAUSE

26.     In October 2022, I received information from a medical device manufacturer that identified unauthorized distributors called Rapid Rx USA LLC and Helping Diabetics USA, Inc., located at 3105 North Main Street in Jacksonville, Florida 32206 (*i.e.*, TARGET PREMISES 2), owned by Mr. Kenneth Fanning ("FANNING") and Mrs. Cynthia Gibson ("GIBSON"). According to the manufacturer, FANNING and GIBSON were selling the manufacturer's diabetic product at significantly reduced prices. The manufacturer suspected these businesses were involved in the diversion of the manufacturer's product, as well as other diabetic products, including prescription drugs and medical devices.

27.     On October 4, 2022, I conducted open-source corporation searches of the Florida Division of Corporations website, sunbiz.org, of FANNING, GIBSON, and the address of TARGET PREMISES 2. I determined from this search that there was an active Florida corporation filing on June 6, 2022, for Rapid Rx USA LLC, located at TARGET PREMISES 2, and Helping Diabetics USA, Inc., originally filed on August 15, 2018, located at 1536 North Market Street in Jacksonville, Florida 32206 (*i.e.*, TARGET PREMISES 1). From these corporate filings, I further determined that both companies were operated by FANNING and GIBSON who were listed as corporate officers. Additionally, I conducted open-source corporation searches of the Georgia Corporations Division website, ecorp.sos.ga.gov, of "Rapid Rx USA." I

12

determined from this search that there was an active Georgia corporation filing on January 7, 2021, for "Rapid Rx USA Inc" located at 555 Charlie Smith Sr Highway, Unit 5, in Saint Marys, Georgia 31558, which was listed as owned and/or operated by FANNING and "Cindy Fanning."

28.     Continuing on October 4, 2022, I conducted open-source Google searches of the business name, Rapid Rx USA, and the address of TARGET PREMISES 2. I located from this search a website for Rapid Rx USA, www.rapidrxusa.com, and a telephone number, (904) 537-2335, for the business. Upon reviewing this website, I determined it was for the sale and/or purchase of medical devices, *i.e.*, diabetic test strips, lancets (small sterile needles used to draw blood for checking blood sugar levels in diabetes patients), and meters/monitors. I did not observe any prescription drugs, inhalers, and/or insulin for sale and/or purchase on this website. I further determined the website listed the business address as being TARGET PREMISES 2. I also located from this search a website for Helping Diabetics USA, www.helpingdiabeticsusa.com, which provided the same telephone number, (904) 537-2335, and listed its address as being TARGET PREMISES 2. Upon reviewing this website, I determined it was for the sale and/or purchase of medical devices, *i.e.*, diabetic test strips, lancets, and meters/monitors. I did not observe any prescription drugs, inhalers, and/or insulin for sale and/or purchase on this website. Additionally, I conducted an open-source Google Maps search of TARGET PREMISES 2 and determined that this address is identified by the business signage of "Elite Beauty Supply" and not Rapid Rx USA or Helping Diabetics USA.

13

Additionally, I conducted an open-source Google Maps search of the address located at 555 Charlie Smith Sr Highway, Unit 5, in Saint Marys, Georgia 31558. I determined from this search that the glass front door of this business displayed the business name of "CM Cambridge Marine."

29.     Continuing on October 4, 2022, I conducted a Florida Driver and Vehicle Information Database (DAVID) check of FANNING and determined his listed residential address is located at TARGET PREMISES 1, the Florida-corporation-filing address of "Helping Diabetics USA, Inc." (see above). Additionally, I also determined from a DAVID check of GIBSON that her listed residential address is also located at TARGET PREMISES 1. I also conducted an open-source search of the Duval County Property Appraiser's website, paopropertysearch.coj.net, for TARGET PREMISES 1 and determined it is owned by FANNING.

30.     On October 5, 2022, I conducted an open-source Florida drug wholesale license verification search utilizing the Florida Department of Business and Professional Regulation's (FDBPR) website, myfloridalicense.com, of Rapid Rx USA LLC, Helping Diabetics USA, Inc., GIBSON, and FANNING. I determined from this search that Rapid Rx USA LLC, Helping Diabetics USA, Inc., GIBSON, and FANNING were not licensed in the State of Florida as a drug or device manufacturer, repackager, logistics provider, or wholesaler. Additionally, I conducted an open-source Georgia drug wholesale license verification search utilizing the Georgia Department of Community Health's website, gadch.mylicense.com, of Rapid Rx USA

14

LLC, Helping Diabetics USA, Inc., GIBSON, and FANNING. I determined from this search that "Rapid Rx USA" located at 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558 has an active "wholesaler pharmacy" license with the State of Georgia. I later confirmed with the Georgia Drugs and Narcotics Agency (GDNA) that Rapid Rx USA was and is solely a licensed wholesale distributor of prescription drugs and is not a pharmacy. Additionally, I contacted the FDBPR and verified that Rapid Rx USA LLC, Helping Diabetics USA, Inc., GIBSON, and FANNING were not licensed in the State of Florida and confirmed Rapid Rx USA LLC, Helping Diabetics USA, Inc., GIBSON, and FANNING are required to be licensed in the State of Florida.

31. On November 1, 2022, I went to TARGET PREMISES 2 and observed the business signage of "Elite Beauty Supply" for this location and not Rapid Rx USA or Helping Diabetics USA. I conducted a trash pull from the trash dumpster located in the rear of this business address location. I observed in the dumpster approximately 135 patient prescription labels that had been removed from various prescription drug and diabetic test strip products, some of which were damaged and destroyed by the process by which they were removed (i.e., heat gun, lighter fluid, etc.). These removed patient prescription labels were inside a cardboard box bearing the name of Helping Diabetics USA and the address of TARGET PREMISES 2. Additionally, I observed partial and whole removed shipping labels that were addressed to and from TARGET PREMISES 2, shipping materials (i.e., adhesive strips, shipping label backers, and address label backers), shipping records, 6 "Rapid Rx USA" sales orders, 11 "Rapid

15

Rx USA" invoices, a "Helping Diabetics USA" purchase order, Amazon Marketplace order receipts for the sale of diabetic products through Amazon, and accompanying informational letters for Rapid Rx and/or Helping Diabetics of the type often included with customer orders. I also observed a spreadsheet, handwritten notes, ice packs (possibly for shipping cold-storage prescription insulin drugs), and empty shipping boxes containing shipping labels that were addressed to and from TARGET PREMISES 2. I also observed a pair of used latex gloves and used cotton balls – all of which are items typically used in removing patient labels/information from previously-dispensed devices and prescription drug products. I also observed damaged medical-device-product boxes (i.e., lancets, diabetic test strips, and inhalers) inside the trash dumpster.

32.     Upon review of the above-described items, I determined that some of the removed patient prescription labels were for the prescription drugs Semaglutide, Aspart, Trelegy Ellipta, Trulicity, Spiriva, Victoza, and Toujeo Max Solostar. Additionally, I observed "Rapid Rx USA" sales orders and invoices bearing the address of the Rapid Rx USA Georgia-licensed wholesale distributor, 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558. The orders and invoices pertained to the sale of some of these prescription drugs (as well as other similar products) to various pharmacies located in Kentucky, Mississippi, Illinois, South Carolina, Oklahoma, New York, and California. Additionally, I observed "Rapid Rx USA" Federal Express (FedEx) shipping labels that utilized the same Georgia-licensed-wholesaler address shipping to pharmacies in Oklahoma and Illinois. I also

16

observed a "Rapid Rx USA" United States Postal Service (USPS) Form 5630 "Shipment Confirmation Acceptance Notice," indicating that 67 packages were picked up from the residential address of FANNING and GIBSON located at TARGET PREMISES 1 and a "Helping Diabetics USA" USPS Form 5630 "Shipment Confirmation Acceptance Notice," indicating that 141 packages were picked up from the business address of TARGET PREMISES 2. I also observed a Helping Diabetics USA purchase order, addressed at TARGET PREMISES 2, indicating that a prescription drug was purchased from an individual. Lastly, I reviewed a spreadsheet bearing the address of TARGET PREMISES 2, and the email address of "Ken@HelpingDiabeticsUSA.com." I further determined that this spreadsheet contained headers listing many medical devices and prescription drugs apparently purchased and sold from TARGET PREMISES 2, such as: test strips, lancets, BD pen needles, meters, glucose monitoring systems, insulin pen packs, insulin vials, and inhalers. The listings included the brand names of the products and the corresponding prices for "mint" or "damaged" products. This spreadsheet also contained a statement on the last page that read, "All insulin and inhaler products have to be nearly perfect. We cannot accept any of these products with rips, tears, stains, ink mark, etc. If there is a prescription label, we suggest letting us remove the labels. We have a special process for removing the labels without harming the boxes. The boxes must be sealed." The spreadsheet appeared to be an instructional document for employees when dealing with customers/patients from whom dispensed drugs and devices would

17

be purchased by the business location. I subsequently inventoried these items as evidence.

33.    On November 8, 2022, I conducted a trash pull from the trash dumpster located behind TARGET PREMISES 2. I observed in the dumpster approximately 164 patient prescription labels that had been removed from various prescription drug and diabetic test strip products, some of which were damaged and destroyed by the process by which they were removed (i.e., heat gun, lighter fluid, etc.). These removed patient prescription labels were inside a cardboard box bearing the name of FANNING and the address of TARGET PREMISES 2. Additionally, I observed 5 outserts (i.e., labeling) for the prescription drugs Januvia, Vraylar, Linzess, Farxiga, and Jardiance, partial and whole removed shipping labels that were addressed to and from TARGET PREMISES 2, shipping materials (i.e., adhesive strips, shipping label backers, and address label backers), shipping records, 12 "Rapid Rx USA" sales orders, 23 "Rapid Rx USA" invoices, 17 "Rapid Rx USA" pick lists, 5 "Helping Diabetics USA" invoices, 4 "Helping Diabetics USA" purchase invoices, Amazon Marketplace order receipts for the sale of diabetic products through Amazon, Helping Diabetic USA thank you letters presumably included with customer orders, 5 of the same type of spreadsheets described above, handwritten notes, ice packs (apparently used for shipping cold-storage prescription insulin drugs), and empty shipping boxes containing shipping labels that were addressed to and from TARGET PREMISES 2. I also observed used latex gloves, used cotton balls, rubber bands, used super glue packets, and an empty Zippo lighter fluid can – again, all of which are items typically

18

used in removing patient labels/information from previously-dispensed devices and prescription drug products. I further observed a patient prescription sheet from a previously-dispensed prescription drug and damaged medical-device-product boxes (i.e., lancets, diabetic test strips, sensor, glucose monitoring systems, transmitter, and receiver) inside the trash dumpster.

34.     Upon review of the above-described items, I determined that some of the removed patient prescription labels were for the prescription drugs NovoLog, Ventolin, Lantus Solostar, Advair, Ozempic, Trelegy Ellipta, Incruse Ellipta, Linzess, Anoro Ellipta, Flovent, Breo Ellipta, and Spiriva. Additionally, I observed "Rapid Rx USA" sales orders and invoices addressed from 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558 for the sale of some of these products (as well as other similar products) to various pharmacies located in Kentucky, Mississippi, Illinois, Oklahoma, New York, Tennessee, Maryland, New Jersey, Utah, and California. Additionally, I observed "Rapid Rx USA" FedEx shipping labels that utilized the same Georgia address shipping to pharmacies in California, Kentucky, Oklahoma, and Illinois. I also observed 3 "Rapid Rx USA" USPS Form 5630 "Shipment Confirmation Acceptance Notices" indicating that 65 packages were picked up from the residential address of FANNING and GIBSON located at TARGET PREMISES 1, and 4 "Helping Diabetics USA" USPS Form 5630 "Shipment Confirmation Acceptance Notices" indicating that 298 packages were picked up from the business address of TARGET PREMISES 2. I also observed Helping Diabetics USA purchase orders for the purchase of diabetic prescription drugs, insulin, and COPD inhalers

19

from individuals/patients and apparent wholesale distributors located in Florida, Arizona, and California. Lastly, I observed a spreadsheet (similar to the one described above) containing the email address "Paypal: ken@HelpingDiabeticsUSA.com," FANNING's name, the address of TARGET PREMISES 2, and the telephone number "904-616-9096." I had previously conducted an open-source check of the telephone number (904) 616-9096, and determined this telephone number belonged to FANNING. I further determined that the spreadsheet contained headers listing, including brand names, many medical devices and prescription drugs apparently purchased and sold from TARGET PREMISES 2, such as: test strips, lancets, BD pen needles, meters, glucose monitoring systems, insulin pen packs, insulin vials, and inhalers and the corresponding prices for mint or damaged products. This particular spreadsheet also contained abbreviations which identified the products purchased/sold as being mail order only ("MO"), durable medical equipment ("DME"), not for retail sale ("NFR"), and for institutional use only ("FIUO"). I also observed listed items referencing "Medicare" next to the item, indicating to me the price that Rapid Rx USA or Helping Diabetics USA would pay a seller for a particular medical device or prescription drug that the patient had received through a federal Medicare program. I subsequently inventoried these items as evidence.

35.     On November 17, 2022, I conducted a trash pull from the trash dumpster located behind TARGET PREMISES 2. I observed in the dumpster approximately 230 patient prescription labels that had been removed from various prescription drug and diabetic test strip products; some of which were damaged and destroyed by the

20

process by which they were removed (i.e., heat gun, lighter fluid, etc.). These removed patient prescription labels were inside a cardboard box bearing the name of Helping Diabetics USA and the address of TARGET PREMISES 2. I also observed removed shipping labels that were addressed to TARGET PREMISES 2, shipping materials (i.e., adhesive strips, shipping label backers, and address label backers), shipping records, 6 "Rapid Rx USA" sales orders, 1 "Rapid Rx USA" pick list, 1 "Helping Diabetics USA" invoice, 3 "Helping Diabetics USA" purchase invoices, an Amazon Marketplace order receipt for the sale of diabetic products through Amazon, 3 spreadsheets, a patient prescription sheet, and empty shipping boxes containing shipping labels that were addressed to TARGET PREMISES 2. I also observed used latex gloves, used cotton balls, and used super glue packets inside this trash receptacle.

36.     Upon review of these items, I determined some of the removed patient prescription labels were for the prescription drugs Trulicity, Levemir, Singular, NovoLog, ProAir HFA, Ozempic, Trelegy, Incruse Ellipta, and Entresto. Additionally, I observed "Rapid Rx USA" sales orders and invoices addressed from the Georgia-licensed-wholesaler at 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558 for the sale of some of these products as well as other similar products to various pharmacies located in Illinois. Additionally, I observed "Rapid Rx USA" shipping receipts that utilized the same Georgia-licensed-wholesaler address shipping to a pharmacy in Illinois. I also observed 2 "Rapid Rx USA" USPS Form 5630 "Shipment Confirmation Acceptance Notices" indicating that 122 packages were picked up from the residential address of FANNING and GIBSON located at

21

TARGET PREMISES 1 and 2 "Helping Diabetics USA" USPS Form 5630

"Shipment Confirmation Acceptance Notices" indicating that 206 packages were

picked up from the business address of TARGET PREMISES 2.  I also observed

Helping Diabetics USA purchase orders for the purchase of diabetic prescription

drugs, insulin, and COPD inhalers from individuals/patients and apparent wholesale

distributors located in Florida, Virginia, and New York.  Lastly, I observed a

spreadsheet (similar to the one described above) containing the email address "Paypal:

ken@HelpingDiabeticsUSA.com," FANNING's name, the address of TARGET

PREMISES 2, and the telephone number "904-616-9096," previously determined to be

FANNING's number.  I further determined this spreadsheet contained headers listing,

including brand names, many medical devices and prescription drugs apparently

purchased and sold from TARGET PREMISES 2, such as:  test strips, lancets, BD pen

needles, meters, glucose monitoring systems, insulin pen packs, insulin vials, and

inhalers and the corresponding prices for "mint" or "damaged" products.  This

particular spreadsheet also contained abbreviations which identified the products sold

as being mail order only ("MO"), durable medical equipment ("DME"), not for retail

sale ("NFR"), for institutional use only ("FIUO") as well as "Medicare" next to the

item, indicating to me the price that Rapid Rx USA or Helping Diabetics USA would

pay a seller for a particular medical device or prescription drug that the patient had

received through a federal Medicare program.  I subsequently inventoried these items

as evidence.

22

37.     Continuing on November 17, 2022, I conducted a trash pull of the trash receptacles pulled to the curb, on the assigned trash collection day, in front of TARGET PREMISES 1 owned and occupied by GIBSON and FANNING. I observed a large black trash bag inside of one of the trash receptacles and collected this trash bag for review. Upon reviewing its contents, I observed a Wells Fargo Bank non-approval letter for a business line of credit addressed to FANNING and Helping Diabetics USA, Inc., a real estate tax notice for this address that was addressed to FANNING, Internal Revenue Service (IRS) correspondence associated with the establishment of an Employer Identification Number (EIN) for Mr. Charles F. Matthews (EIN: 86-2786008) and This N That LLC (EIN: 92-0945780), bank check stubs for payments from Rick's Pharmacy, Inc., an empty envelope addressed to FANNING and Rapid Rx USA from Slater Drug Co, order instructional sheets, and a handwritten notebook pad. I subsequently inventoried these items as evidence.

38.     Continuing on November 17, 2022, I conducted a physical address check on the Georgia-licensed-wholesaler Rapid Rx USA Inc. located at 555 Charlie Smith Sr Highway, Unit 5, in Saint Marys, Georgia 31558. I determined no one was at or inside this business at this time. I determined the glass front door of this business contained the business name of "CM Cambridge Marine," which name does not appear in Georgia's licensed-wholesaler record for this address.

39.     On November 29, 2022, I made an undercover telephone call to Rapid Rx USA LLC, at the telephone number, (904) 537-2335, listed on their website. I received an answer of "hello" from what appeared to be a young male who did not

23

identify himself. I explained that I was trying to get in touch with Rapid Rx USA and the unknown male replied, "yes, how can I help you?" I confirmed Rapid Rx USA sells diabetic medication, products, and supplies, and requested to make an order. The unknown male subsequently advised the owner, FANNING, does all the sales, is currently out of town for the holidays, and I would have to speak with him. The unknown male collected my information and advised he would have FANNING contact me. I did not hear back from FANNING.

40.     On January 12, 2023, I conducted a physical address check of Rapid Rx USA Inc. located at 555 Charlie Smith Sr Highway, Unit 5, in Saint Marys, Georgia 31558. I determined no one was at or inside this business at this time. I again observed the name "CM Cambridge Marine" on the outside of the building.

41.     On January 19, 2023, I conducted a trash pull from the trash dumpster located behind TARGET PREMISES 2. I observed in the dumpster approximately 546 patient prescription labels that had been removed from various prescription drug and diabetic test strip products, some of which were damaged and destroyed by the process by which they were removed (i.e., heat gun, lighter fluid, etc.). These removed patient prescription labels were inside a cardboard box bearing the name of FANNING and the address of TARGET PREMISES 2. I also observed partial and whole removed shipping labels that were addressed to TARGET PREMISES 2, shipping materials (i.e., adhesive strips, shipping label backers, and address label backers), shipping records, Amazon.com shipping receipts for the sale of diabetic products through Amazon, 8 "Rapid Rx USA" sales orders, 3 "Rapid Rx USA"

24

invoices, 4 "Helping Diabetics USA" purchase orders, used latex gloves and used cotton balls, and pharmacy patient prescription bags with patient prescribing paperwork and drug fact sheets.

42.     Upon review of these items, I determined that some of the removed patient prescription labels were for the prescription drugs Lantus, Wixela, Bydureon Bcise, Baqsimi, Spiriva, Levemir, Humalog, Ventolin, Ozempic, Trulicity, Trelegy, and NovoLog.  Additionally, I observed "Rapid Rx USA" sales orders and invoices addressed from the Georgia-licensed-wholesaler at 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558 for the sale of some of these products, as well as other similar products, to various pharmacies located in Illinois, Mississippi, Maryland, and Kentucky.  These sales orders and invoices were very similar to those that I previously recovered from TARGET PREMISES 2's trash dumpster, although the phone number listed on these latest documents did not list FANNING's known telephone number, (904) 616-9096, and instead provided the number (912) 913-4912. Additionally, I observed "Rapid Rx USA" shipping labels (for shipping to individuals in North Carolina and Illinois) utilized the same Georgia address as the return address.  I also observed a "Rapid Rx USA" shipping label utilizing the residential address of GIBSON and FANNING located at TARGET PREMISES 1.  I also observed Helping Diabetics USA purchase orders for the purchase of the prescription drugs Admelog, Lantus, Ozempic, and Eliquis from individuals/patients and apparent wholesale distributors located in Nevada, Georgia, and California.  Lastly, I observed pharmacy bags containing patient prescription paperwork associated with the

25

dispensing of the prescription drugs Lantus, NovoLog, Levemir, Symbicort, Glargine, and Apixaban, as well as paperwork guides (i.e., Setup Guide, Reference Guide, Support Guide, and Warrant/Registration Guide) for a new HP Laser Jet Pro MFP 4101 (Printer/Fax/Copier/Scanner) with wireless Wi-Fi and Internet connectivity, and an empty 500ct white copy paper package. I subsequently inventoried these items as evidence.

43.     Continuing on January 19, 2023, I conducted a trash pull of the trash receptacles pulled to the curb, on the assigned trash collection date, in front of TARGET PREMISES 1 owned and occupied by GIBSON and FANNING. I observed a large black trash bag inside of one of the trash receptacles and collected this trash bag for review. Upon reviewing its contents, I observed a United Parcel Service shipping label addressed to FANNING and Helping Diabetics at TARGET PREMISES 2. Additionally, I observed two brown Amazon shipment envelopes with affixed Amazon shipping labels addressed to FANNING at TARGET PREMISES 1, one of which contained an unopened box of diabetic lancets. Lastly, I observed discarded mail addressed to both GIBSON and FANNING. I subsequently inventoried these items as evidence.

44.     On January 31, 2023, I received information from FDA/OCI Senior Operations Manager for the FDA's Center for Drug Evaluation and Research stating that Rapid Rx USA LLC, Rapid Rx USA Inc., and Helping Diabetics USA, Inc. have never registered with FDA as a drug manufacturing establishment at TARGET PREMISES 1 or TARGET PREMISES 2. Additionally, I received information from

26

the FDA/OCI Senior Operations Manager for the FDA's Center for Devices and Radiological Health stating that Rapid Rx USA LLC, Rapid Rx USA Inc., and Helping Diabetics USA, Inc. have never registered with the FDA as a device manufacturing establishment at TARGET PREMISES 1 or TARGET PREMISES 2.

45.    On February 2, 2023, I conducted a trash pull from the trash dumpster located behind TARGET PREMISES 2. I observed in the dumpster approximately 144 patient prescription labels that had been removed from various prescription drug and diabetic test strip products, some of which were damaged and destroyed by the process by which they were removed (i.e., heat gun, lighter fluid, etc.). These removed patient prescription labels were inside cardboard boxes bearing the name of FANNING and the address of TARGET PREMISES 2. I also observed partial and whole removed shipping labels that were addressed to TARGET PREMISES 2, shipping materials (i.e., adhesive strips, shipping label backers, and address label backers), shipping records, lids to shipment boxes containing shipping labels that were addressed to TARGET PREMISES 2, eBay and Amazon.com shipping receipts for the sale and return of diabetic products through eBay and Amazon, 28 "Rapid Rx USA" sales orders, 11 "Rapid Rx USA" invoices, 3 "Helping Diabetics USA" purchase orders, an empty 500 count white copy paper wrapping, discarded opened or damaged prescription drugs and inhalers, spreadsheets, pharmacy prescription bags, an ice pack (apparently used for shipping cold-storage prescription insulin drugs), and used latex gloves, an empty heat gun box, empty Zippo lighter fluid cans, and used cotton balls.

27

46.    Upon review of these items, I determined that some of the removed patient prescription labels were for the prescription drugs Lantus, NovoLog, Trelegy Ellipta, Trulicity, Eliquis, Jardiance, and Ozempic.  Additionally, I observed "Rapid Rx USA" sales orders and invoices addressed from the Georgia-licensed-wholesaler at 555 Charlie Smith Sr Highway, Unit 5, Saint Marys, Georgia 31558 for the sale of some of these products, as well as other similar products, to various pharmacies located in Illinois, Maryland, Mississippi, California, Oklahoma, Tennessee, Utah, and Kentucky, including Rick's Pharmacy and Slater Drug Company.  Additionally, I observed "Rapid Rx USA" shipping labels for shipping to pharmacies located in Utah and California that utilized the same Georgia return address.  I also observed shipping labels that identified pharmacies located in Illinois shipping to "Rapid Rx USA" at TARGET PREMISES 2.  I also observed Helping Diabetics USA purchase orders and invoices, addressed as TARGET PREMISES 2, for the purchase of the prescription drugs Spiriva, Arnuity Ellipta, Trelegy, Breo Ellipta, Flovent, Advair, Wixela, Anoro Ellipta, Humalog, Basaglar, Atrovent, Qvar, and Levemir from individuals/patients and apparent wholesale distributors located in Wisconsin, Georgia, and California.  I also observed a pharmacy bag containing patient prescriptions associated with the dispensing of the prescription drug Ozempic.  I also observed Amazon vendor return receipts addressed to FANNING at TARGET PREMISES 1.  I also observed 3 "Rapid Rx USA" USPS Form 5630 "Shipment Confirmation Acceptance Notices" indicating that 59 packages were picked up from the residential address of FANNING and GIBSON located at TARGET PREMISES 1 and 2 "Helping Diabetics USA"

28

USPS Form 5630 "Shipment Confirmation Acceptance Notices" indicating that 130 packages were picked up from the business address of TARGET PREMISES 2. Lastly, I observed a spreadsheet (similar to the one described above) containing the email address "Paypal: ken@HelpingDiabeticsUSA.com," FANNING's name, the address of TARGET PREMISES 2, and the telephone number (904) 616-9096, previously determined to belong to FANNING. I further determined this spreadsheet contained headers listing, including brand names, many medical devices, and prescription drugs apparently purchased and sold from TARGET PREMISES 2, such as: test strips, lancets, BD pen needles, meters, glucose monitoring systems, pens, vials, and inhalers and the corresponding prices for "mint" or "damaged" products. This particular spreadsheet also contained abbreviations which identified the products sold as being mail order only ("MO") or durable medical equipment ("DME"), not for retail sale ("NFR"), for institutional use only ("FIUO") as well as "Medicare" next to the item, indicating to me the price that Rapid Rx USA or Helping Diabetics USA would pay a seller for a particular medical device or prescription drug that the patient had received through a federal Medicare program. Furthermore, this spreadsheet also contained a statement on the last page that read, "Please Note Condition on Mint boxes 7 plus months is very important. Boxes need to be absolutely perfect. For Dings 7 plus months -$3.00. Dings= 1 small crease or small dent Damaged= Any rips/tears/dents/multiple creases/ Please no stained or gross boxes. Feel free to text pics for clarification." I subsequently inventoried these items as evidence.

29

47.     Continuing on February 2, 2023, I conducted a trash pull of the trash receptacles pulled to the curb, on the assigned trash collection day, in front of TARGET PREMISES 1, again which is owned and occupied by GIBSON and FANNING. I observed a white 13-gallon trash bag inside of one of the trash receptacles and collected this trash bag for review. Upon reviewing its contents, I observed a pharmacy prescription for the patient "Cindy Gibson" that was addressed to her at TARGET PREMISES 2. Additionally, I observed an empty prescription bottle, containing a torn prescription label, addressed to a patient who resides on Capitola Street in Jacksonville, Florida. Lastly, I observed mail addressed to "Cindy Gibson," "Ken Fanning," and "Cynthia D Gibson" at this address.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

48.     As described in Attachment B, these applications seek permission to search for records that might be found at TARGET PREMISES 1 and 2, in whatever form they are found. As described above, FANNING's and GIBSON's businesses market products through the use of websites, maintain email addresses, and like most businesses today, presumably store certain records electronically. Thus, one form in which the records might be found at TARGET PREMISES 1 or 2 is as data stored on a computer's hard drive or other storage media. Accordingly, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30

49.     Based on my training and experience, I know that modern commercial entities, including businesses that sell drugs, use computer equipment to store business records, communicate with suppliers, and track sales, expenses, and inventory.

50.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

51.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or

31

delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.    *Forensic evidence.* As further described in Attachment B, these applications seek permission to locate not only computer files that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in TARGET PREMISES 1 or 2 because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

32

Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a business. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain

33

information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet

34

searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For

35

example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

36

volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the TARGET PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media. Records sought under these warrants could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrants, and would authorize a later review of the media or

37

information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

55. To the extent that the targets of this investigation are conducting some legitimate business, the seizure of computers may limit their ability to conduct lawful commerce. As with any search warrant, I expect that these warrants will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, investigators will copy data, rather than physically seize computers. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

56. Based upon the foregoing facts, along with my training, experience, and consultation with others, I respectfully submit that there is probable cause to believe that the items described in Attachment B are currently located at TARGET PREMISES 1 and TARGET PREMISES 2, in the Middle District of Florida, and that those items constitute evidence or instrumentalities of the crimes of 21 U.S.C. §§ 331(a), (k), (p), and (t); 18 U.S.C. § 670(a) (2), (3), and (6). Specifically, there is probable cause to believe that FANNING and GIBSON are using TARGET

38

PREMISES 1 and TARGET PREMISES 2 to operate illicit businesses, which purchase medical devices and drugs that have already been sold or otherwise distributed to members of the public, relabel and repackage those items, and then resell them, all without the appropriate licenses from the State of Florida and without registering with the FDA.

57.    Accordingly, I respectfully request the issuance of search warrants for TARGET PREMISES 1 (described in Attachment A1) and TARGET PREMISES 2 (described in Attachment A2) to seize and search the items described in Attachment B.


Houston E. Ramsey Jr.
Special Agent
U.S. Food and Drug Administration
Office of Criminal Investigations


Subscribed and sworn to before me on this 27TH day of February 2023, in Jacksonville, Florida.

Laura Lothman Lambert
United States Magistrate Judge

39

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ D

CLERK'S OFFICE
A TRUE COPY
May 17, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Business located at 1017 West Glen Oaks Lane,<br>Suite 212, Mequon, Wisconsin 53092, more fully<br>described in Attachment A. | )<br>)<br>)<br>)<br>)<br>) Case No.    23   MJ   103 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

A business located at 1017 West Glen Oaks Lane, Suite 212, in Mequon, Wisconsin 53092. More fully described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      5/31/2023      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. William E. Duffin      .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      5/17/2023 at 10:52 AM          William E. Duffin
                                                                                *Judge's signature*

City and state:      Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
                                                                                *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Premises to Be Searched

The business to be searched (TARGET PREMISES) is located at 1017 West Glen Oaks Lane, Suite 212, in Mequon, Wisconsin 53092. As depicted below, the TARGET PREMISES is a business suite located on the second floor within the Glen Oaks Office Park building numbered "1017" which is south of West Glen Oaks Lane and east of North Port Washington Road. The Glen Oaks Office Park building is a two-story brick structure with gray and tan trim. The suite number "212" is displayed to the oak wood signage for this suite with the business name of "R & J Credit Group LLC" attached to the oak wood door of the suite.






1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.      Medical devices and drugs, and any item that reasonably appears to be a misbranded and/or unapproved device or drug;

2.      Records and information pertaining to the ordering, shipping, purchasing, online marketing, selling, distribution, holding, and the storage of medical devices or drugs;

3.      Records, information and items concerning any off-site locations capable of storing records, medical devices, or drugs, including safe deposit box keys, and records, receipts, and rental agreements concerning such storage locations;

4.      Records and information associated with the purchase or sale of labeling, printing or graphics which could be used to create labeling or documentation of medical devices or drugs;

5.      Items that can be used to remove, create, or affix labeling, printing, or graphics to medical devices, drugs, or their packaging;

6.      Records and information evidencing occupancy or ownership of the premises to be searched, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, checks and check registers, and financial records;

7.      Records and information pertaining to the establishment, ownership, and method of operation of Cream City Medical Depot LLC, The Elite Jackson Group LLC, R & J Wealth Consulting LLC, R & J Credit

1

Group LLC, R & J Logistics LLC, Brew City Medical LLC, or Ryan Jackson Trucking Inc.;

8.    Any and all computers, printers, computer equipment, hard drives, and other electronic storage medium that could be used for the ordering, shipping, purchasing, or selling of any drugs; used to create labeling, printing, or graphics for devices, drugs, or their packaging; or used to store or create any records or information, the seizure of which is authorized by this warrant;

9.    For any computer or storage medium whose seizure is otherwise authorized by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

d.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

e.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

f.    contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as

2

hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Without applying for another search warrant, this warrant authorizes the search of any COMPUTER whose seizure is otherwise authorized by this warrant for the items, records, and information authorized to be seized, as described above.

This warrant authorizes the seizure of digital records and information described above only to the extent that they were created, saved, or edited during time period from January 1, 2021, through the date of execution of the warrant, except that evidence of who used, owned, or controlled a COMPUTER may be from any period of time through the date of the execution of the warrant.

3